IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

ANDREW MYERS, *et al.*,
    Plaintiffs,

v.                                Civil No. 3:23cv755 (DJN)

MERCEDES-BENZ USA, LLC,
    Defendant.

### MEMORANDUM OPINION

This matter comes before the Court on Defendant Mercedes-Benz USA, LLC's

("Defendant" or "MBUSA")) Motion for Summary Judgment, ("MSJ," ECF No. 67), on

Plaintiffs Andrew Myers ("Myers") and Road Runner Transportation & Delivery's ("Road

Runner" and altogether with Myers, "Plaintiffs") Motions to Exclude Testimony, (ECF Nos. 60,

62), and on Defendant's Motions to Exclude Testimony, (ECF Nos. 70, 72). This matter also

comes before the Court on Plaintiffs' Motion for Sanctions for Failure to Obey a Discovery

Order, ("Sanctions Motion," ECF No. 91), Plaintiffs' Motion for Leave to File Supplemental

Briefing, ("Supplemental Briefing Motion," ECF No. 100), Plaintiffs' Motion for Leave to File

Supplemental Authority, ("Supplemental Authority Motion," ECF No. 102), and Plaintiffs'

Motion for Leave to File Supplementation of the Record, ("Record Supplementation Motion,"

ECF No. 104). For the reasons stated herein, the Court will GRANT Plaintiffs' Record

Supplementation Motion, (ECF No. 104); will GRANT Defendant's Motion for Summary

Judgment, (ECF No. 67), on Counts I, II and III of Plaintiffs' First Amended Complaint, (ECF

No. 20); will DENY the Motion to Exclude the Testimony of Jacyn Damera, (ECF No. 60); and

will DENY AS MOOT the other pending Motions to Exclude Testimony, (ECF Nos. 62, 70, 72).

The Court will also DENY Plaintiffs' Sanctions Motion, (ECF No. 91), Supplemental Briefing

Motion, (ECF No. 100), and Supplemental Authority Motion, (ECF No. 102).

## I.     BACKGROUND

### A.     Factual Background

Because summary judgment requires an assessment of the undisputed facts, Local Civil

Rule 56(b) directs a movant to include an enumerated list of material facts as to which the

movant contends that no genuine dispute exists.  The non-movant must then respond by stating

whether the fact is disputed or admitted, and if disputed, to provide citations to evidence in the

record supporting the claim of a factual dispute.  *See* Local Civ. R. 56(B) (requiring that an

opposition brief responding to a summary judgment motion "shall include a specifically

captioned section listing all material facts as to which it is contended that there exists a genuine

issue necessary to be litigated and citing the parts of the record relied on to support the facts

alleged to be in dispute.")  When resolving summary judgment motions, "the Court may assume

that facts identified by the moving party in its listing of material facts are admitted, unless such a

fact is controverted in the statement of genuine issues filed in opposition to the motion."  *Id.*

Here, Defendant complied with Local Rule 56(B).  (Amended Mem. in Supp. of MSJ

(ECF No. 80) ("MSJ Mem.") at 2.)  Plaintiffs' counsel initially failed to comply with Local Rule

56(B), instead weaving various arguments regarding the factual record throughout his opposition

brief.  (Resp. in Opp. to MSJ (ECF No. 90) ("MSJ Opp.").)  However, after Plaintiffs filed a

motion to amend their opposition brief so that they could add a section of allegedly disputed

facts, (ECF No. 93), the Court permitted them to do so, (ECF No. 96).[1]

---

[1]     The Court observes that the initial failure of Plaintiffs' counsel to comply with Local
Rule 56(B) constitutes merely the latest of numerous procedural errors on his part in this case.
For instance, Plaintiffs' counsel "wholly fail[ed] the threshold requirement of making a good-

The Court thus endeavors to construe the facts in the light most favorable to Plaintiffs as the non-moving party, including consideration of those facts that they appear to dispute. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  Viewing the evidence through such a lens, the following narrative constitutes the facts for purposes of resolving Defendant's MSJ.

Road Runner constitutes a business entity in the freight transportation industry.  (Dep. Tr. of Andrew Myers, (ECF No. 67-1) ("Myers Dep. Tr.") at 13:7–13.)  Specifically, Road Runner is a limited liability company ("LLC") incorporated under Florida law that is wholly owned by Myers.  (ECF No. 90-6 at 2, 6.)  On April 14, 2022, Road Runner purchased a 2022 Mercedes-Benz Sprinter Cargo Van (the "Vehicle") from the Mercedes-Benz of Fredericksburg.  (ECF No. 67-4.)  The Buyer's Order listed Road Runner as the only purchaser.  (*Id.*)  The Vehicle is registered to Road Runner, and this registration form — issued in Florida — does not constitute a Virginia "personal use" registration.  (ECF No. 67-8.)  Although he did not qualify as a purchaser of record for the Vehicle, Myers informs the Court that he "attempted to buy this vehicle . . . for both personal and business use."  (Decl. of Andrew Myers, (ECF No. 90-1) ("Myers Decl.") at 1.)  And while the record does not reflect that Road Runner purchased the Vehicle *because* Plaintiffs saw a particular advertisement for the Vehicle, Plaintiffs present advertisements from Defendant-MBUSA that market Sprinter Vans as usable for both recreational and business purposes.  (ECF Nos. 90-3, 90-4, 90-5.)

---

faith attempt to meet and confer" with Defendant's counsel before filing a frivolous Motion to Compel that the Court denied.  (ECF No. 48.)  Additionally, Plaintiffs' counsel failed to timely answer a set of Requests for Admissions from Defendant's counsel, leading to motions practice and necessitating the Court's resolution of Plaintiffs' subsequent Motion to Permit the Admissions to be Withdrawn.  (ECF No. 52.)  In each instance, the Court granted Plaintiffs' counsel leniency, first by refraining from imposing sanctions on him for his hastily brought and plainly rejectable Motion to Compel, then by permitting him to withdraw his admissions and lastly by allowing him to belatedly amend his MSJ opposition brief to add a section of disputed facts.  (ECF Nos. 48, 74, 96.)

The Vehicle has two seats in the front area and an open bed/cargo area. (Myers Dep. Tr. at 27:9–11). One door of the Vehicle displays U.S. Department of Transportation ("DOT") numbers. (Exhibit 3 (ECF No. 69-3) at 6 of Aff. In Supp. of MSJ by Jacyn Damera (ECF No. 69) ("Damera Decl.").) The Vehicle also sports a FedEx logo on its doors. (*Id.* at 5–7, 9.) In connection with the purchase of the Vehicle, Road Runner purchased a "Commercial Van Extended Limited Warranty Agreement." (ECF No. 67-7); (Myers Dep. Tr. at 48:10–25). When the Vehicle was delivered, it was accompanied by the MBUSA written limited warranty booklet (the "Warranty Book"). (ECF No. 67-6.)

The Warranty Book states, in relevant part, that "Warranty Coverage applies to all vehicle owners during the warranty coverage period." (*Id.* at 3.) If a vehicle owner uses the vehicle "primarily for business and commercial purposes, then these implied warranties do not apply and MBUSA completely disclaims them to the extent allowed by law." (*Id.* at 6.) This page of the Warranty Book also states the following:

> "NO PAYMENT OR OTHER COMPENSATION WILL BE MADE FOR INDIRECT OR CONSEQUENTIAL DAMAGE OR INJURY TO PERSON OR PROPERTY OR LOSS OF REVENUE WHICH MIGHT BE PAID, INCURRED OR SUSTAINED BY REASON OF THE FAILURE OF ANY PART OR ASSEMBLY WHICH MAY BE REPAIRED OR REPLACED IN ACCORDANCE WITH THE TERMS OF THE WARRANTY."

(*Id.*) The Warranty Book also includes a "Diesel Engine Limited Warranty" section, which creates a coverage period of "up to 5 years or 100,000 miles on the odometer, whichever comes first." (*Id.* at 11.) Furthermore, the "Items Which Are Not Covered" section includes a subsection entitled "Extra Expenses," which states that the "warranty does not cover payment for loss of use of the vehicle during warranty repairs nor lodging bills, substitute transportation rentals, or other travel costs, telephone calls, loss of pay, or other economic loss or consequential damages." (*Id.* at 15.)

After Road Runner purchased the Vehicle, Myers used the Vehicle in connection with delivering freight as an independent contractor for three different entities, garnering $18,144 in profits in connection with the deliveries for these three companies in 2022. (Myers Dep. Tr. at 35–38; 174–79.) In November 2022, Road Runner entered into an agreement with FedEx Custom Critical, Inc. ("FedEx"), that permitted FedEx to use it for freight delivery. (Myers Dep. Tr. at 31:24–32:2; 136:2–25); *see also* (Agreement for Leased Equipment and Independent Contractor Services ("FedEx Contract") (ECF No. 67-12)); (Pl.'s Resp. to Interrogatory Nos. 4 and 11, (ECF No. 67-10)).

During Plaintiffs' use of the Vehicle, Myers brought the Vehicle to various MBUSA-affiliated repair shops, generating four separate repair orders to fix problems with the engine's performance, including with the powertrain and exhaust system. (Dep. Tr. of Jacyn Damera (ECF No. 76-2) ("Damera Dep. Tr.") at 114:13–25.) After these four attempts, the Vehicle's "check engine" light remained on, and Defendant's designated expert, Jacyn Damera ("Damera"), testified that MBUSA currently lacks a way to correct the Vehicle's "check engine" light malfunction. (*Id.* at 115:6–18.)

A review of the Plaintiffs' repair history summary indicates that the Vehicle was driven 37,523 miles from April 15, 2022 through August 1, 2022; 25,020 miles from August 1, 2022 through November 14, 2022; 26,824 miles from November 16, 2022 through February 21, 2023; and 7,575 miles from February 21, 2023 through September 28, 2023. (ECF No. 67-9.) Accordingly, from November 16, 2022 through September 28, 2023, the Vehicle was driven 34,339 miles. (*Id.*) From November 30, 2022 through September 15, 2023, the Vehicle accrued 26,403 miles under Road Runner's contract with FedEx. (ECF No. 67-13.)

## B.   Procedural Background

On November 8, 2023, Plaintiffs filed their original Complaint. (ECF No. 1.) On

December 14, 2023, Defendant answered, (ECF No. 14), and on February 9, 2024, Plaintiffs

filed their First Amended Complaint ("FAC," ECF No. 20), which brings the following claims:

Count I alleges that Defendant Mercedes-Benz USA, LLC violated the Magnusson-Moss

Warranty Act, 15 U.S.C. §2301 *et seq.* ("MMWA") by breaching express and implied warranties

in connection with its failure to repair the Vehicle; Count II alleges that Defendant violated

Virginia's Motor Vehicle Warranty Enforcement Act, Va. Code. § 59.1-207.9 *et seq.* ("Lemon

Law") by failing to repair Plaintiffs' vehicle after a reasonable number of attempts; and Count III

brings a breach-of-contract claim under the Uniform Commercial Code ("UCC").[2] (FAC ¶¶ 13–

24.)

On March 1, 2024, Defendant filed a Motion to Dismiss Counts I and II of the FAC for

failure to state a claim. (ECF No. 29.) By Memorandum Opinion and Order dated April 18,

2024, the Court denied Defendant's Motion to Dismiss. (ECF Nos. 35–36.)

Following the close of discovery, the parties filed a spate of motions to exclude testimony

pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Specifically,

on June 17, 2024, Plaintiffs filed Motions to Exclude Testimony of Jacyn Damera, ("Damera

Motion," ECF No. 60) and of Brian Maloney, ("Maloney Motion," ECF No. 62). On June 24,

---

[2]     On November 17, 2023, before effectuating service of process against Defendant,
Plaintiffs filed an "Amended Complaint" that appeared to substantively comprise a duplicate of
their original Complaint. (ECF No. 5.) However, Plaintiffs styled their February 9, 2024
amended complaint as the "First Amended Complaint," and this pleading brought an additional
claim (the UCC claim). (ECF No. 20.) Accordingly, because the November 17, 2023 pleading
appears to constitute a duplicate of Plaintiffs' original Complaint and because all parties referred
to the February 9, 2024 pleading as the "First Amended Complaint" in their briefing for the MSJ,
the Court refers to the February 9, 2024 pleading as the "First Amended Complaint."

2024, Defendant filed Motions to Exclude Testimony of Plaintiffs' Experts Francesco Renna, ("Renna Motion," ECF No. 70), and Brian Woodrow, ("Woodrow Motion," ECF No. 72). On June 27, 2024, Defendant filed its opposition briefs to the Damera Motion and Maloney Motion, (ECF Nos. 76–77), and Plaintiffs filed their own opposition briefs to the Renna Motion and Woodrow Motions, (ECF No. 78–79). On July 1, 2024, Defendant replied in further support of its Renna Motion and Woodrow Motion, rendering those motions ripe for review. (ECF Nos. 81–82.) On July 8, 2024, Plaintiffs filed reply briefs for their Damera Motion and Maloney Motion, rendering those motions ripe for review. (ECF Nos. 86–87.)

Furthermore, on June 21, 2024, Defendant filed the instant Motion for Summary Judgment. (ECF No. 67.) On June 29, 2024, Defendant filed an amended brief, (ECF No. 80), in support of its MSJ, pursuant to the Court's June 26, 2024 Order, (ECF No. 74), granting Defendant leave to file an amended brief, in light of Plaintiffs' untimely withdrawal of various admissions during discovery. On July 10, 2024, Plaintiffs responded in opposition to the MSJ. (ECF No. 90.) Defendant replied on July 16, 2024, rendering the MSJ ripe for review. (ECF No. 97.)

In addition, and in keeping with the notably acrimonious nature of discovery in this suit,[3] Plaintiffs filed their pending Sanctions Motion on July 11, 2024. (ECF No. 91.) There, Plaintiffs noted that the Court, in a June 17, 2024 Order, required Defendant to "produce all documents describing, evaluating, explaining or discussing warranty and manufacturing defects, breakdowns, or failures related to exhaust gas recirculation valves and/or NOx sensors installed in diesel engines for the 2022 Sprinter Van model that Plaintiffs purchased." (ECF No. 59.) On

---

[3]   *See supra*, note 1 (discussing Plaintiffs' counsel's filing of a frivolous motion to compel, among other instances of procedural error during the discovery process).

June 28, 2024, Defendant produced additional discovery responses pursuant to the Court's Order. (Sanctions Motion at 1.)  Plaintiffs contend that Defendant's submissions, which included a chart of warranty data in connection with this discovery request, came in an unreadable format and thus could not be useful in opposing the MSJ. (*Id.* at 7–8.)  As a result, Plaintiffs seek sanctions against Defendant, including dismissal of the MSJ, prohibiting Defendant "from defending at trial" and "a significant monetary sanction." (*Id.* at 12.)

Defendant responded on July 17, 2024, pointing out that the produced documents can easily be read if Plaintiffs' counsel had simply used the "zoom" feature on a standard keyboard. (Def.'s Opp. to Sanctions Motion (ECF No. 98) ("Sanctions Opp.") at 4.)  As Defendant emphasized, the produced data included nationwide warranty claim information for various motor vehicle parts, along with information on particular complaints and repair work. (*Id.* at 4.) Plaintiffs replied on June 23, 2024, rendering their Sanctions Motion ripe for review. (ECF No. 99.)

Next, on July 26, 2024, Plaintiffs filed their Supplemental Briefing Motion, requesting the Court's leave to file a supplemental brief that lays out Plaintiffs' argument that the Vehicle qualifies as a "motor home" and thus falls subject to Virginia's Lemon Law. (Mem. in Supp. of Supp. Br. Mot. (ECF No. 101-1) ("Supp. Br.") at 3.)

On July 30, 2024, Plaintiffs filed their Supplemental Authority Motion, requesting the Court's leave to submit supplemental authority in further opposition to Defendant's MSJ. (ECF No. 102.)  And lastly, on August 1, 2024, Plaintiffs filed their Record Supplementation Motion, requesting the Court's leave to supplement the record with a copy of a certificate of authorization that Virginia's State Corporation Commission (the "SCC") issued to Road Runner. (ECF No. 104.)

On August 6, 2024, Defendant filed a consolidated opposition brief responding to Plaintiffs' Supplemental Briefing Motion, Supplemental Authority Motion and Record Supplementation Motion.  (ECF No. 106.)  On August 12, 2024, Plaintiffs replied, rendering these three motions ripe for review.  (ECF No. 107.)

## II.      STANDARD OF REVIEW

### A.      Discovery Sanctions

Federal Rule of Civil Procedure 34(b)(2)(E)(ii) provides that parties must produce requested documents or electronically stored information "in a reasonably usable form or forms." Rule 37(b)(2)(A) permits a district court to impose sanctions where a party "fails to obey an order to provide or permit discovery."  When determining the proper sanctions under Rule 37, courts "must consider (1) whether the non-complying party acted in bad faith, (2) the amount of prejudice that noncompliance caused the adversary, (3) the need for deterrence of the particular sort of non-compliance, and (4) whether less drastic sanctions would have been effective." *Jones v. Campbell Univ.*, 2023 WL 34172, at *1 (4th Cir. Jan. 4, 2023).

### B.      *Daubert* Motions

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if" the following conditions are satisfied:

> (a) the expert's scientific, technical, or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 thus establishes "a district court's gatekeeping responsibility to 'ensure that an expert's testimony both rests on a *reliable* foundation and is *relevant* to the task at hand.'" *Nease v. Ford Motor Company*, 848 F.3d 219, 229 (4th Cir. 2017) (quoting *Daubert*, 509 U.S. at 597). In undertaking this gatekeeping function, the district courts enjoy "broad latitude" to consider whatever factors prove applicable given "the unique circumstances of the expert testimony involved." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). The Rule 702 inquiry necessarily proves "flexible," focusing on the expert's "principles and methodology" rather than the conclusions that they draw. *Id.*

Throughout its Rule 702 analysis, a district court must remain cognizant of two bedrock, yet competing principles. On the one hand, Rule 702 "was intended to liberalize the introduction of relevant expert evidence." *Id.* District courts therefore "need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct." *Id.* On the other hand, expert testimony often proves uniquely capable of confusing or misleading the jury. *Id.* Given that, "proffered evidence that has a greater potential to mislead than to enlighten" should therefore be excluded. *Id.* Critically, the proponent of expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10).

Additionally, while Rule 702 governs the admissibility of expert testimony generally, Federal Rule of Evidence 703 prescribes the court's "relatively narrow inquiry" into an expert's reliance on otherwise inadmissible information. Fed. R. Evid. 703. Rule 703 provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

Fed. R. Evid. 703. Rule 703 thus controls only "whether an expert reasonably relied upon inadmissible information in forming [his] opinions." *Goodrich v. John Crane, Inc.*, 2018 WL 4677773, at *19 (E.D. Va. Sept. 28, 2018).

## C.    Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958–59 (4th Cir. 1996). The party seeking summary judgment has the burden to identify the parts of the record indicating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted).

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Whether a fact is considered "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists by going "beyond the pleadings." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). In reviewing a summary judgment motion, the Court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978

F.2d 832, 835 (4th Cir. 1992) (citing *Anderson*, 477 U.S. 242, 255 (1986)); *see also Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007). Thus, the Court must assess whether Defendant has demonstrated no genuine issue of material fact such that no reasonable jury could return a verdict for Plaintiffs.

### D.    Supplemental Briefing Motion

Local Rule 7(F)(1) lays out this Court's standard briefing schedule and provides that, beyond an initial memorandum in support of a motion, a non-movant's opposition brief and a reply from the movant, "[n]o further briefs or written communications may be filed without first obtaining leave of Court." Federal Rule 56(e)(1) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," a court may "give an opportunity to properly support or address the fact." Fed. R. Civ. P. 56(e)(1). District courts maintain discretion in determining whether to allow supplemental briefing on a summary judgment motion. *Old White Charities, Inc. v. Bankers Ins., LLC*, 799 F. App'x 176, 178–79 (4th Cir. 2020). Where supplemental briefing fails to give rise to any disputes of material fact, district courts do not abuse their discretion in denying leave to file a supplemental briefing. *Id.* at 179.

### E.    Supplemental Authority Motion

A court possesses discretion to permit the introduction of supplemental authority after the completion of the standard briefing schedule, and courts within this District have granted such requests when the supplemental authority stands relevant to the Court's analysis on issues in a pending case. *Gibbs v. Stinson*, 421 F. Supp. 3d 267, 282 n.29 (E.D. Va. 2019), *aff'd sub nom. Gibbs v. Sequoia Cap. Operations, LLC*, 966 F.3d 286 (4th Cir. 2020). For instance, where a party seeks to call the Court's attention to a recently issued judicial opinion after a motion has

12

been fully briefed, such circumstances can merit the filing of supplemental authority. *Estrada v. Miller*, 2024 WL 98151, at *1 n.1 (E.D. Va. Jan. 8, 2024).

### F.     Record Supplementation Motion

District courts also possess discretion to grant a motion to supplement the record. *A.B. by L.K. v. Smith*, 2023 WL 3533595, at *1 (4th Cir. May 18, 2023). Indeed, this Court has granted a motion to supplement the record even where the new filing "does not cure the deficiencies" in the moving party's earlier filings. *Meekins v. Lakeview Loan Servicing, LLC*, 2019 WL 7340300, at *2 n.2 (E.D. Va. Dec. 30, 2019).

## III.     ANALYSIS

The Court begins by dispensing with Plaintiffs' Sanctions Motion, before turning to the *Daubert* motions, then to the MSJ and Record Supplementation Motion and lastly to Plaintiffs' Supplemental Briefing Motion and Supplemental Authority Motion.

### A.     Sanctions Motion

Plaintiffs' Sanctions Motion has no merit, flailing about as yet another unnecessary discovery filing. Defendant demonstrated no bad faith here, instead timely complying with the Court's June 17, 2024 Order by producing reems of detailed warranty claim data to Plaintiffs. The failure of Plaintiffs' counsel to simply zoom in on the warranty data does not mean that Defendant exhibited bad faith. Instead, Plaintiffs' counsel's rush to file a motion for sanctions represents the latest episode in a lengthy stream of unnecessary motions practice in this case, as outlined above. If Plaintiffs' counsel had simply conferred with Defendant in a good-faith manner, he could have easily discerned the clear readability of the produced data. *See, e.g.*, (Sanctions Opp. at 4) (screenshotting a zoomed-in, readable picture of the warranty data). Indeed, the Court was able to zoom in (and read) on this data *in Plaintiffs' own motion*, as shown

13

below by a screenshot from the first page of exhibits that Plaintiffs submitted with their

Sanctions Motion:

| CLAIM NO | DEALER CODE | DEALER NAME | CDE DLR ST | VEH YEAR | REPAIR DATE |
|----------|-------------|-------------|------------|----------|-------------|
| 70410603 | 45102 | PLAZA MOTOR COMPANY | MO | 2022 | 4/26/2022 |
| 70798395 | 05759 | CALIBER MOTORS INC. | CA | 2022 | 8/3/2022 |

(ECF No. 92-1 at 1.) Defendant's counsel in fact informed Plaintiffs' counsel that the document

could easily be viewed upon zooming in, but rather than pausing to grapple with this news,

Plaintiffs' counsel yet again rushed to file an unnecessary motion. (Sanctions Opp. at 3.)

Plaintiffs reply that the produced data counts as unusable due to difficulties in printing

the chart. (Pls.' Reply Br. (ECF No. 99) at 3.) But just because Plaintiffs' counsel encountered

some difficulty *printing* this chart onto condensed pages does not mean that the data stands

unusable, as comprehensive data charts and spreadsheets often must be printed on numerous

pages for readability. Accordingly, any failure on the part of Plaintiffs' counsel to use the

warranty data in advancing his case stands entirely with him, not with Defendant. The Court will

thus DENY the Sanctions Motion, (ECF No. 91), as frivolous.

## B.   Motion to Exclude Testimony of Jacyn Damera

Plaintiffs argue that the Court should exclude testimony from Damera, a field service

engineer for Defendant-MBUSA, because he admitted in his deposition that he did not qualify as

"an expert on whether a vehicle meets the warranty or not" regarding the Vehicle. (Mem. in

Supp. of Damera Mot. (ECF No. 61) ("Damera Mem.") at 5–6.) Contending that all the claims

hinge on whether Defendant fulfilled its warranty obligations, Plaintiffs assert that Damera thus

cannot serve as a relevant expert here, particularly since Defendant disclosed Damera as an

14

expert to "offer testimony regarding the written limited warranty." (*Id.*) Plaintiffs also highlight that Damera only saw the Vehicle once — on June 7, 2024, pursuant to Defendant's inspection as part of the discovery process — and argue that he therefore cannot tie his observations that day to opining on compliance with the warranty. (*Id.* at 6.)

In response, Defendant argues that Plaintiffs "cherry-picked" excerpts from Damera's deposition transcript to misconstrue his ability to render technical opinions on the Vehicle. (Def.'s Opp. to Damera Motion (ECF No. 76) ("Damera Opp.") at 1.) Because the Vehicle's "normal operating characteristics, diagnosis[] and repairs are all issues" that fall within Damera's scope of expertise, Defendant contends that his testimony would serve to assist the factual understanding of the issues in the case, particularly since he concluded that the Vehicle "is not exhibiting any failures that are inhibiting its drivability or usage." (*Id.* at 2.)

Damera certainly possesses the qualifications to render an opinion on the technical issues in this case, as he has held Automotive Service Excellence certifications (including a certification in the type of engine — diesel — that the Vehicle possesses) for numerous years. (ECF No. 76-1 at 1.) Indeed, Damera has worked with Mercedes-Benz vehicles for over two decades. (*Id.*) And during Damera's examination of the Vehicle, he conducted standard observational work for the industry, noting the exterior and interior conditions as well as its mechanical workings, checking for fault codes and test-driving the Vehicle. (ECF No. 76-3.) Plaintiffs thus offer no credible attack on the qualifications of Damera, nor on the principles and methods that he employed in his examination. Fed. R. Evid. 702.

Furthermore, Plaintiffs' attempt to pigeonhole Damera as an improper "warranty" expert does not carry weight with the Court. First, as Defendant notes, MBUSA's written limited warranty does not constitute the sort of document that requires expert testimony, as a warranty

15

booklet in a vehicle generally does not require "scientific, technical, or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." *Id.* Second, to the extent that Damera's testimony relates the degree of Defendant's compliance with the relevant warranty, his testimony goes to the underlying mechanical condition of the Vehicle and technical observations about repair efforts, which necessarily inform an understanding of whether and how Defendant met its warranty obligations. The question of warranty compliance thus stands necessarily related to the technical details of the Vehicle's condition. Indeed, Defendant positions Damera as able to discuss both the applicable warranty and "MBUSA's service manuals, information bulletins, technical service bulletins, policies and procedures, the Vehicle's repair history, as well as his own experience as it relates to the inspection, diagnosis and repair of the Vehicle and like-model vehicles" and to address that "to a reasonable degree of technical certainty that any conditions complained of by Plaintiffs in the Vehicle were properly repaired." (ECF No. 76-4 at 2.)

Upon review, the Court concludes that Plaintiffs make too much of the fact that Damera, an automotive technician, had not committed to memory specific portions of the written Warranty Book during his deposition, particularly since he apparently did not have a copy of the booklet in front of him. *See* (Dep. Tr. of Jacyn Damera (ECF No. 76-2) ("Damera Dep. Tr.") at 46:10–17) (Damera's answer to Plaintiffs' counsel's questions regarding the warranty manual: "You're asking me a lot of questions off of memory, and you want to get the specifics about warranty manual questions. I would like to have the manual in front of me so we can refer to it because I didn't write the manual.").

Because the Court concludes that Damera's "testimony both rests on a *reliable* foundation and is *relevant* to the task at hand," *Nease*, 848 F.3d at 229, the Court rejects

Plaintiffs' *Daubert* attack on his expert testimony as a red herring, and will therefore DENY the

Damera Motion, (ECF No. 60).

### C.      Other *Daubert* Motions

Because Defendant repeatedly relies on Damera's expert declaration in the pending MSJ,

the Court began its analysis with the Damera Motion.  (MSJ Mem. at 3, 7, 9, 13.)  As no party's

summary judgment briefs discussed the other individuals whose testimony also stand subject to

*Daubert* motions — Brian Maloney, Francesco Renna and Brian Woodrow — the Court

DENIES AS MOOT these motions, (ECF Nos. 62, 70, 72), because the Court will grant the MSJ

and dismiss with prejudice Plaintiffs' claims for the reasons given below.

### D.      Motion for Summary Judgment

The Court next proceeds to the MSJ, examining each claim in turn.  "As the non-

movant[s], [Plaintiffs] ha[ve] a duty to offer *evidence* establishing a triable issue and to cite to

'particular parts of materials in the record.'"  *Eversole v. Ford Motor Co.*, 2012 WL 1161420, at

*4 (E.D. Va. Apr. 6, 2012) (citing Fed. R. Civ. P. 56(c)(1)(A); E.D. Va. Loc. R. 56(B)).

### 1.      Standing and Record Supplementation Motion

As an initial matter, the Court examines Defendant's argument that Road Runner lacks

standing, because the discovery process established that Road Runner did not possess

authorization to conduct business in Virginia.  (MSJ Mem. at 20.)  As part of this inquiry, the

Court considers Plaintiffs' Record Supplementation Motion, (ECF No. 104).

Of relevance here, Va. Code § 13.1-1057 provides that "a foreign limited liability

company transacting business in the Commonwealth may not maintain any action, suit, or

proceeding in any court of the Commonwealth until it has registered in the Commonwealth."

And "[a]s the Supreme Court held decades ago, state statutes precluding those not authorized to

do business in the state from utilizing the court system apply equally in federal diversity actions." *Church Ins. Co. of Vermont v. Collins & Lacy, P.C.*, 2020 WL 3051246, at *3 n.5 (D.S.C. June 8, 2020) (Childs, J.) (citing *Woods v. Interstate Realty Co.*, 337 U.S. 535, 538 (1949)).

Here, Road Runner — a Florida-based LLC — admitted in response to one of Defendant's interrogatories that, during the discovery period, it was not authorized to conduct business in Virginia. (ECF No. 67-10 at 9.)  However, "a foreign limited liability company may file suit in Virginia without first registering for business as long as it registers before the final disposition of the case." *Goodall v. LVNV Funding, LLC*, 2023 WL 3687967, at *5 (E.D. Va. May 26, 2023) (citing *Nolte v. MT Tech. Enters., LLC*, 726 S.E.2d 339, 345 (Va. 2012)). Although Plaintiffs should have been aware of Road Runner's registration responsibility from the outset, the Court notes that they filed — before issuance of this Memorandum Opinion — their Record Supplementation Motion, attaching as an exhibit a copy of a certificate of authorization from the SCC permitting Road Runner to transact business in Virginia. (ECF No. 104-1.)  The certificate bears a date of August 1, 2024.  (*Id.*)  Because Plaintiffs secured this registration before issuance of final judgment in the case at bar, Road Runner can bring the federal *and* state law claims. *Nolte*, 726 S.E.2d at 345.  The Court thus will GRANT Plaintiffs' Record Supplementation Motion, (ECF No. 104), and proceeds to analyzing each claim.

### 2. Lemon Law Claim

Count II constitutes a claim under Virginia's Lemon Law, which authorizes "[a]ny consumer who suffers loss by reason of a violation" of its statutory provisions to bring a civil action.  Va. Code § 59.1-207.14.  The statute defines a "consumer" as:

> [t]he purchaser, other than for purposes of resale, or the lessee, of a motor vehicle used in substantial part for personal, family, or household purposes, and any

18

> person to whom such motor vehicle is transferred for the same purposes during the duration of any warranty applicable to such motor vehicle, and any other person entitled by the terms of such warranty to enforce the obligations of the warranty.

*Id.* § 59.1-207.11. The statute provides that "[m]otor vehicle[s]" are defined as "only passenger cars, pickup or panel trucks . . . as those terms are defined in § 46.1-100." *Id.* This provision defines "passenger car" as "every motor vehicle other than a motorcycle or autocycle designed and used primarily for the transportation of no more than 10 persons, including the driver." *Id.* § 46.2-100. Furthermore, the statute defines "pickup or panel trucks" as:

> (i) every motor vehicle designed for the transportation of property and having a registered gross weight of 7,500 pounds or less or (ii) every motor vehicle registered for personal use, designed to transport property on its own structure independent of any other vehicle, and having a registered gross weight in excess of 7,500 pounds but not in excess of 10,000 pounds.

*Id.* Here, because the Vehicle has a registered gross weight of 9,000 pounds, the Vehicle does not meet the first definition of a "pickup or panel truck." (ECF No. 67-8.) The second definition also does not apply, as the Vehicle is only registered to the business entity, Road Runner (and in Florida, not Virginia). (*Id.*) Plaintiffs do not contest that the Vehicle lies outside the "pickup or panel truck" definitions. Accordingly, the only way that the Vehicle could count for a Lemon Law claim lies with qualifying as a "passenger car."[4]

The Court must therefore decide "if the evidence is such that a reasonable jury could return a verdict for" Plaintiffs on their Lemon Law claim, *Anderson*, 477 U.S. at 248, which would require the jury to find that the Vehicle qualifies as a "passenger car." This question turns on whether the Vehicle was "designed and used primarily for the transportation of no more than 10 persons, including the driver." Va. Code § 46.2-100. "'[P]rimary' when applied to a single

---

[4]    The Court addresses and rejects Plaintiffs' argument that the Vehicle qualifies as a "motor home" *infra* in Section III.E.

subject often means first, chief, or principal." *Bd. of Governors of the Fed. Reserve System v. Agnew,* 329 U.S. 441, 446 (1947); *see also Burke v. THOR Motor Coach, Inc.*, 113 F. Supp. 3d 863, 869 (E.D. Va. 2015) ("Certainly, people sleep in their cars, but that does not turn a passenger car into a motor home."); *PREVOR v. Food & Drug Admin.,* 895 F.Supp.2d 90, 98 (D.D.C.2012) ("Primary means principal, first among others, foundational.").

While Virginia case law does not shed light on whether a Sprinter Van specifically qualifies as "designed and used primarily for the transportation of no more than 10 persons," Plaintiffs offer various exhibits illustrating that MBUSA has marketed Sprinter Vans for personal transportation. Such exhibits include: (1) an advertisement linking to a news article that described the Sprinter as "the base vehicle of choice for custom camper vans"; (2) advertisements on the Meta social media platform stating, in pertinent part, "Whether you're on the job or off the beaten path, a Mercedes-Benz Sprinter is built to make your own road," and depicting images of Sprinter Vans in settings that evoke nature expeditions; and (3) a LinkedIn advertisement stating "Face the tougher terrain with ease in the Sprinter, in order to find your way to the better ones." (ECF Nos. 90-3, 90-4, 90-5.) By contrast, in Defendant's view, the Vehicle constitutes a commercial delivery van. *See* (MSJ Mem. at 6, quoting Meyers Dep. Tr. At 27:9–12 (["No passenger seats. There is just two seats in the front and an open bed all the way back to the rear door."]."))

Although the Court must, at the summary judgment stage, "draw all justifiable inferences in favor of the nonmoving party," *Carolina Transformer Co.*, 978 F.2d at 835, a jury's finding that the Vehicle was "designed and used primarily for the transportation of no more than 10 persons" would strain credulity for numerous reasons. First, in explaining why he does not use the Vehicle for his work as an Uber rideshare app delivery driver, Myers himself testified that

20

"you can't even have passengers in there." (Myers Dep. Tr. at 11:5–8.) Myers' testimony underscores that the Vehicle, with just two passenger seats and an open area in the rear for cargo, hardly qualifies as "designed and used primarily" for the transportation of a small group of people. Following Plaintiffs' argument that the Vehicle constitutes a "passenger car" would, as Defendant notes, lead to the absurd result of sweeping any two-seater vehicle into the scope of the Lemon Law, which would then be stretched to include a commercial dump truck or a tractor trailer. (Def.'s Reply Br. (ECF No. 97) ("Def.'s Reply") at 6 – 7.)  While a driver could sleep in a tractor trailer, for instance, this does not make such a vehicle a "passenger car." *See Burke*, 113 F. Supp. 3d at 869 (sleeping in a car does not make it a motor home).  So too here.

Second, the precise type of Sprinter Van at issue here — a 2022 Mercedes-Benz Sprinter *Cargo* Van — constitutes a distinct product subcategory targeted toward the transportation of *cargo*, not individuals.  Indeed, Defendant introduced numerous advertising exhibits of its own in rebuttal of Plaintiffs' handful of cherrypicked advertisements, including the page in the Sprinter Van brochure that specifically outlines the vehicular model that Road Runner bought: the Cargo Van. *See* (ECF No. 97-1 at 5) (depicting a Sprinter Cargo Van in a warehouse setting and showing that the model has no windows on the sides).  The exhibits contrast Plaintiffs' Cargo Van model with the "Sprinter Passenger" and "Sprinter Crew" models that feature photographs of the transportation of *both* people and cargo.  (*Id.* at 5–7.)  On the record before the Court, the Vehicle falls far from plausibly constituting a "passenger car," even when drawing all justifiable inferences in favor of Myers.

Furthermore, to succeed on a Lemon Law claim, Plaintiffs must still demonstrate that they qualify as "consumers" under the statute.  Even when giving them all justifiable inferences at the summary judgment stage (and even setting aside the question of whether the Vehicle

21

constitutes a "passenger car"), the Court concludes that Plaintiffs cannot plausibly meet their burden of qualifying as consumers of a vehicle used "in substantial part for personal, family, or household purposes."

As outlined above, Virginia's Lemon Law places only two textual limitations on who can qualify as a "consumer": (1) they cannot purchase a vehicle "for purposes of resale" and (2) they must purchase, lease, or receive via transfer a vehicle "used in substantial part for personal, family, or household purposes." Va. Code § 59.1-207.11. Put another way, the statute's "consumer" definition encompasses any person to whom the vehicle "is transferred" for usage "in substantial part for personal, family, or household purposes" and "any other person entitled by the terms of such warranty to enforce the obligations of the warranty." *Id.*

Road Runner, a business entity in the freight transportation industry, (Myers Dep. Tr. at 13:7–13), cannot qualify as a consumer. To argue that this corporate LLC could be entitled to a presumption of using a freight delivery vehicle "in substantial part for personal, family, or household purposes" and thereby could qualify as a "consumer" under the Lemon Law strikes the Court as an illogical contortion by Plaintiffs. *See* Va. Code § 59.1-207.10 (describing the General Assembly's "intent" behind the statute and stating that "[t]he General Assembly recognizes that a motor vehicle is a major **consumer** purchase, and there is no doubt that a defective motor vehicle creates a hardship for the **consumer**") (emphases added). The Court next considers whether Myers alone could qualify as a "consumer."

In denying Defendant's motion to dismiss, the Court ruled that "the question of whether Road Runner 'transferred' or 'leased' the van to Myers constitutes a factual one that the Court should refrain from resolving in a motion to dismiss." (ECF No. 35 at 16.) Now, at the summary judgment stage, the Court examines whether Defendant has demonstrated that no

22

genuine issue exists as to whether Myers counts as a consumer and thus whether a reasonable jury could return a verdict for him on the Lemon Law claim.

The record reflects no evidence that Myers leased the Vehicle from Road Runner and *does* reflect that Road Runner constitutes the sole official purchaser of the Vehicle. (ECF No. 67-4.) In addition, Myers did not produce any written agreement or other documentation of formal transfer of the Vehicle from Road Runner to Myers. *See* (ECF No. 67-11 at 3) (Plaintiffs' response of "N/A" to Defendant's interrogatory asking for the date and documentation of transfer); (*id.* at 5–6) (Plaintiff responded "N/A. There are none" to Defendants' interrogatory asking to "[i]dentify any written agreements between Plaintiff Road Runner and Plaintiff Andrew Myers relating to Plaintiff Andrew Myers' use of the subject vehicle for personal purposes").

Myers counters that he could transfer the Vehicle between himself and his business without formal documentation, because "as a member and owner of the LLC, he transferred equitable title to himself personally for the use of the vehicle for personal, family, or household purposes." (MSJ Opp. at 13.) In his view, "[n]o magical or talismanic document was necessary for this," because the transfer "just occurred naturally," as "Myers' right to use his corporate assets for personal use is sanctioned and protected by the law." (*Id.* at 13–14.)

The Court expresses skepticism that a reasonable jury could find that, in the absence of concrete evidence of a formal transfer, Road Runner transferred the Vehicle to Myers. But even *if* a jury made such a finding on the basis that Myers constituted the owner of the LLC here, Defendant stands entitled to summary judgment on the Lemon Law claim, because a motor vehicle at issue in such a case must be "used in substantial part for personal, family, or household purposes." Va. Code § 59.1-207.11. Indeed, the statute makes clear that the motor

23

vehicle must be used for "for the same purposes" by "any person to whom such motor vehicle is transferred." *Id.*

Here, Road Runner, i.e., the buyer of record and a commercial entity in the freight transportation industry, purchased the Vehicle. (ECF No. 67-4.) Road Runner subsequently entered into a contract with FedEx for use of the Vehicle in the delivery business, including "leasing" the Vehicle to FedEx. (ECF No. 67-12.) After inspecting the Vehicle, Damera noted its DOT numbers and "FedEx" lettering on the door. (Ex. 2 to Damera Decl. (ECF No. 69-2) at 1.) Damera also observed that, consistent with commercial usage, the Vehicle only has two passenger seats in the front, with the entire rear area open, no windows on the side or rear, a tracking onboard tablet and other markings of business use. (Damera Decl. at 2.) He remarked that, based on his experience, "the 2022 Sprinter Van generally is used in the commercial context." (*Id.*) Furthermore, Myers admitted that he used the Vehicle in connection with freight delivery for three separate companies *before* entering into the FedEx contract in November 2022, garnering $18,144 in income from these deliveries. (Myers Dep. Tr. at 35–38, 174–79.)

Plaintiffs admitted during discovery that that they could not provide any specific details as to the number of miles that the Vehicle was driven in connection with the freight delivery business as opposed to for Myers' personal purposes, and instead in conclusory fashion state that the Vehicle was used for personal purposes. But conclusory statements, standing alone, fail to meet a plaintiff's burden at summary judgment. *Smith v. Del Toro*, 2024 WL 1576808, at *1 (4th Cir. Apr. 11, 2024). While Myers' declaration states that he lived in the Vehicle "for about a year" and took "ten or more personal trips using" the Vehicle, (Myers Decl. at 2), the Court finds that Myers has not presented "sufficient evidence to allow reasonable jurors to find that he has proven his claims by a preponderance of the evidence," which a plaintiff must do at the

24

summary judgment stage, *Smith*, 2024 WL 1576808, at *1. Indeed, Damera's analysis concluded that the Vehicle was "driven an average of 45,161 miles per year." (Ex. 2 to Damera Decl. (ECF No. 69-2) at 4). Such an extraordinary amount of mileage belies the notion that the Vehicle was used *in substantial part* for personal purposes and underscores the substantial extent to which the Vehicle's usage during the pendency of the FedEx contract stemmed from commercial purposes. From November 16, 2022 through September 28, 2023, the Vehicle was driven 34,339 miles. (ECF No. 67-9.) And from November 30, 2022 through September 15, 2023, the Vehicle accrued 26,403 miles under Road Runner's contract with FedEx. (ECF No. 67-13.) Taken together, this data indicates that over 76 percent of the Vehicle's usage during that time period derived from the FedEx contract. This usage came *after* Myers engaged in freight delivery work for multiple other companies (and notably, Road Runner only bought the Vehicle in April 2022). (Myers Dep. Tr. at 35–38; 174–79.)

Moreover, Damera concluded that the "service history is consistent with the vehicle being used for commercial purposes." (Ex. 2 to Damera Decl. (ECF No. 69-2) at 4.) And although Myers contends that he used the Vehicle for ten or more personal trips, (Myers Decl. at 2), Defendant persuasively lays out the sheer implausibility that taking these trips means that he used the Vehicle in substantial part for personal, family or household purposes, as these trips would almost certainly not even total 25,000 miles — out of more than 96,000 miles driven. (ECF No. 67-9) (documenting the Vehicle's mileage data); *see also* (Def.'s Reply at 9–10) (observing that Myers' trips to southern California, New York and Colorado would constitute a distinct minority share of the Vehicle's mileage).

The General Assembly clearly meant the Lemon Law to protect *consumers* who suffer harm from a defective vehicle. *See* Va. Code § 59.1-207.10 (describing the General Assembly's

"intent" behind the statute and stating that "[t]he General Assembly recognizes that a motor vehicle is a major consumer purchase, and there is no doubt that a defective motor vehicle creates a hardship for the consumer"). Here, the owner of a LLC in the freight delivery business sought to use the Lemon Law to bring a claim as a "consumer" despite not being listed as the individual purchaser of the Vehicle, generating mileage data that clearly aligns with commercial usage and, critically, failing to produce sufficient evidence that he used the Vehicle "in substantial part for personal, family, or household purposes." Relatedly, a finding that the Vehicle constitutes a "passenger car" under the statute would strain credulity. Taken together, this evidence indicates that no reasonable jury could find that Plaintiffs used the Vehicle "in substantial part for personal, family, or household purposes." Va. Code § 59.1-207.11. Accordingly, the Court will GRANT Defendant's MSJ with respect to Count II, i.e., the Lemon Law claim.

### 3.    Magnuson-Moss Warranty Act Claim

Count I alleges that Defendants violated the MMWA due to the defective condition of the Vehicle. To qualify under the MMWA, the Vehicle must be a "consumer product," as that term is defined by the statute and applicable regulations. "[T]he MMWA defines the term 'consumer product,' in relevant part, as 'any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes . . . .'" *Shonk v. Fountain Power Boats*, 338 Fed. App'x 282, 287 (4th Cir.2009) (quoting 15 U.S.C. § 2301(1)). The enabling regulations provide that "a product is a 'consume product' if the use of that type of product is not uncommon." 16 C.F.R. § 700.1(a).

An owner's "subjective purpose for purchasing the [vehicle] is irrelevant," and "[a]s the nonmoving party, [Plaintiffs] ha[ve] a burden to offer more than a mere 'scintilla of evidence'

26

concerning the common uses of the [vehicle] at issue in the consumer marketplace." *Eversole v. Ford Motor Co.*, 2012 WL 1161420, at *5 (E.D. Va. Apr. 6, 2012); *see also* 16 C.F.R. § 700.1(a) ("[T]he use to which a product is put by an individual is not determinative"); *Crume v. Ford Motor Co.,* 60 Or. App. 224, 653 P.2d 564, 567 (Ore. App.1982) (occasionally transporting groceries in a flatbed truck does not transform it into a consumer product).

"To determine the 'normal' use of a product, courts may employ a common sense understanding of the product." *Eversole*, 2012 WL 1161420, at *5 (citing *Russo v. NCS Pearson, Inc.,* 462 F.Supp.2d 981, 998 (D. Minn. 2006) (concluding that SAT preparation materials do not resemble the consumer products listed in the Federal Register or the legislative history of the Act) and *Clark v. Jim Walter Homes, Inc.,* 719 F.Supp. 1037, 1043 (M.D. Ala. 1989) (concluding that a prefabricated home resembles real property excluded from the definition of "consumer products" under the Act)). Courts have also considered the manufacturer's description of the product, how it is advertised and the purpose for which it is designed. *See, e.g., People ex rel. Mota v. Central Sprinkler Corp.,* 174 F.Supp.2d 824, 829–30 (C.D. Ill. 2001); *Essex Ins. Co. v. Blount, Inc.,* 72 F.Supp.2d 722, 723 (E.D. Tex. 1999). Moreover, "[w]here it is unclear whether a particular product is covered under the definition of consumer product, any ambiguity will be resolved in favor of coverage." 16 C.F.R. § 700.1(a).

Here, Plaintiffs point to Myers' declaration (in which he states that he lived in the Vehicle for about a year and used it for personal trips) and MBUSA's advertisements as evidence for creating a genuine issue of material fact as to whether the Vehicle constitutes one "normally used for personal, family, or household purposes." (MSJ Opp. at 10–11.) As to the first piece of evidence, neither Myers' subjective intent in obtaining the Vehicle nor his particularized uses resolve whether a MMWA claim could apply to the Vehicle. *Eversole*, 2012

27

WL 1161420, at *5; 16 C.F.R. § 700.1(a). As to the MBUSA advertisements that marketed

Sprinter Vans as usable in both personal and business contexts, the Court observes that a

defendant's advertisements can shed light on whether a product counts as normally used for

personal, family or household purposes. *Central Sprinkler Corp.,* 174 F.Supp.2d at 829–30.

Relatedly, "[s]ome products may have both personal and commercial 'normal' uses and such

dual-purpose products may still be 'consumer products' under the" MMWA. *Zendejas v.

Redman*, 2016 WL 1242349, at *6 (S.D. Fla. Mar. 30, 2016).

But as with the Lemon Law claim, these advertisements do not carry the day for

Plaintiffs, because as a matter of law and based on the record before the Court, this particular

type of Sprinter Van does not fall within the purview of the MMWA. While Plaintiffs cite to

*Zendejas* for the dual-purpose proposition noted above, (MSJ Opp. at 11), the *Zendejas* court's

decision came at the pleading stage, denying a motion to dismiss a MMWA claim. 2016 WL

1242349, at *6. Here, discovery has closed. And one undisputed fact stands out from reviewing

the Buyer's Order between Road Runner and MBUSA: the Vehicle constitutes a 2022

Mercedes-Benz Sprinter *Cargo* Van. (MSJ Mem. at 2); *see also* (ECF No. 67-4). Where the

relevant product in a MMWA case has many subcategories, "[a]nalysis must be more fine-

grained." *Waypoint Aviation Servs. Inc. v. Sandel Avionics, Inc.*, 469 F.3d 1071, 1072 (7th Cir.

2006); *see also Velez v. RM Acquisition, LLC*, 670 F. Supp. 3d 620, 634 (N.D. Ill. 2023)

(dismissing MMWA claim, because relevant subtype of GPS product was designed for and sold

to commercial truck drivers, rather than to ordinary consumers).

As numerous federal courts have recognized, MBUSA's Sprinter Vans come in multiple

models — some of which (like the Vehicle here) constitute *cargo* vans, as opposed to passenger

28

vans.[5]  Taken together, these cases, although not resolving MMWA claims regarding a Sprinter

Cargo Van, clearly distinguish between the various models of Sprinter Vans in general.  Here, as

the Buyer's Order and the photographs that Damera attached to his affidavit illustrate, the

Vehicle constitutes a Sprinter *Cargo* Van.  (ECF Nos. 67-4; 69-3.)  Application of "a more fine-

grained" analysis demonstrates that Plaintiffs' proffered advertisements serve as a red herring.

*Waypoint*, 469 F.3d at 1072.  Indeed, Defendant's opening brief links to MBUSA's Sprinter Van

website, which features a "Build Your Van" banner across the page and lists four options among

the "Sprinter" class of vans:  a Cargo Van, Crew Van, Passenger Van and Cab Chassis.[6]  Thus,

even narrowly focusing (as Myers would have the Court do) on the way in which MBUSA

*advertises* Sprinter Vans reveals that Defendant advertises the Sprinter "Cargo" Vans and

"Passenger" Vans as separate products.

    As the United States Court of International Trade remarked in a case concerning Sprinter

Cargo Vans, "[t]he most important, indispensable and necessary characteristic of a cargo van is

its ability to transport goods." *Pleasure-Way Indus., Inc. v. United States*, 38 ITRD 1889, at *5

---

[5]     *See, e.g., River States Truck & Trailer, Inc. v. Daimler Vans USA LLC*, 604 F. Supp. 3d
733, 735 (W.D. Wis. 2022) ("Sprinter Vans sold by the Freightliner and Mercedes-Benz dealers
were available in various specifications and styles, including **cargo vans, passenger vans**, crew
vans, and chassis cabs."); *Pleasure-Way Indus., Inc. v. United States*, 878 F.3d 1348, 1349–53
(Fed. Cir. 2018) (noting that where manufacturer of motorhomes bought Sprinter Vans and then
*converted* them to motorhomes, "the Sprinter Vans were marketed primarily as cargo vans, with
the potential for other uses if they were modified by purchasers"); *Pleasure-Way Indus., Inc. v.
United States*, 38 ITRD 1889, at *5 (Ct. Int'l Trade 2016), *aff'd*, 878 F.3d 1348 (observing that
in a case concerning Sprinter Vans, "as the defendant averred, '[t]he most important,
indispensable and **necessary characteristic of a cargo van is its ability to transport goods'**");
*see also Digby Adler Grp., LLC v. Mercedes-Benz U.S.A., LLC*, 2015 WL 1548872, at *1 (N.D.
Cal. Apr. 7, 2015) ("Defendant Mercedes–Benz USA released a second generation Sprinter Van
in the United States," and "**[t]his new model offered a 'passenger' configuration**," as opposed
to a cargo version) (emphases added).

[6]     MERCEDES-BENZ, *"Build Your Van"* (last accessed July 16, 2024),
https://www.mbvans.com/en/vehicles/build#sprinter [perma:  https://perma.cc/JH5N-JGN2].

(Ct. Int'l Trade 2016), *aff'd*, 878 F.3d 1348; *see id.* at *6 (noting the Sprinter "cargo vans' essential characteristics of being able to transport cargo"). Damera's photos and affidavit further buttress this conclusion regarding the cargo model of Sprinter Vans. *See* (Damera Decl. at 2) ("During my inspection of the Vehicle, I observed that this Vehicle was clearly being used commercially."); (ECF No. 69-2 at 3) ("Observations noted is that this van is used for commercial use for FedEx time critical transport and Millhouse, a time critical carrier company. This was concluded by the Omnitracs tablet in the van as well as the DOT stickers found on the van.").

While Plaintiffs make much of MBUSA's advertisements demonstrating the dual-purpose uses of Sprinter Vans, their attempt (as with the Lemon Law claim) to generalize to the level of *all* Sprinter Vans fails to account for this differentiated product market. And Plaintiffs do not present evidence that MBUSA marketed *this* product, i.e., a 2022 Sprinter *Cargo* Van, to him or anyone else as suitable for both business and personal use. In sum, then, Plaintiffs "offer[] no evidence addressing how common it might be to employ these [Sprinter Cargo Vans] for 'personal, family or household' purposes." *Eversole*, 2012 WL 1161420, at *6. Accordingly, even when drawing all reasonable inferences in Plaintiffs' favor and thus inferring that *other* types of Sprinter Vans qualify as "normally used for personal, family or household purposes," the Court holds that Plaintiffs failed to present "sufficient evidence to allow reasonable jurors to find that [they have] proven [their] claims by a preponderance of the evidence." *Smith*, 2024 WL 1576808, at *1. The Court will therefore GRANT summary judgment for Defendant on Count I.[7]

---

[7]    Because the Court concludes that the MMWA claim merits summary judgment on the basis of Plaintiffs' failure to present sufficient evidence to allow reasonable factfinders to find that the MMWA applies to the Vehicle here, the Court sees no need to address the parties'

### 4.    UCC Claim

The Court now turns to Count III, i.e., the UCC breach-of-contract claim.  The FAC alleges that Defendant breached the contract and its warranties on account of the Vehicle possessing defective parts in the engine so that the engine could not run, resulting in the Vehicle and warranties failing to meet their essential purpose.  (FAC ¶ 23.)  Citing to Va. Code § 8.2-715(2) for the applicable standard governing the measurement of damages in a breach-of-contract claim, the FAC alleges that "Plaintiffs could not fulfill dozens of written contract offers made to them by Fed-Ex," and that "[b]ased on the actual work history with Fed-Ex," Myers stands entitled to $10,000 per month in lost profits, along with incidental costs, attorneys' fees and litigation expenses.  (*Id.* at 7–8.)

"To state a breach-of-contract claim under Virginia law, a plaintiff must show: '(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation.'"  *Fakunmoju v. Bayview Loan Servicing, LLC*, 2022 WL 18028422, at *11 (E.D. Va. Mar. 18, 2022).  As a threshold matter, Defendant argues that because Myers does not constitute the legally recognized owner of the Vehicle, he lacks standing to assert the UCC claim, as the Warranty Book includes no legally enforceable obligation to a non-owner.  (MSJ Mem. at 16.)  As discussed above, Myers does not constitute the purchaser on the Buyer's Order or on the Vehicle's Florida registration:  both documents only list Road Runner.  (ECF Nos. 67-4, 67-8.)  Furthermore, discovery established that FedEx constituted the only entity to which Road Runner leased the Vehicle, while Plaintiffs stated in their interrogatory responses that no written

dispute regarding the issues of an express warranty and implied warranty of merchantability pursuant to Count I.

agreements exist between Road Runner and Myers relating to Myers' use of the Vehicle.  (ECF No. 67-10 at 3, 5.)

Rather than producing evidence indicating that he constitutes an owner of the Vehicle and thus individually can assert a claim under the warranty, Myers responds that "as a member and owner of the LLC, he transferred equitable title to himself personally for the use of the vehicle for personal, family, or household purposes."  (MSJ Opp. at 13.)  As Defendant points out, "Virginia law contains specific requirements for transfer of title to a vehicle," as given by Va. Code § 46.2-628.  (Def.'s Reply at 8.)  Myers argues that since he owns the business that bought the Vehicle, he can bring a breach-of-contract claim.  This conclusory statement, standing alone, stands bereft of legal authority.

But perhaps in awareness of his failure to properly support his argument, Myers — two weeks after the parties fully briefed the MSJ — filed a Supplemental Authority Motion, which requests leave to file supplemental authority in further opposition to the MSJ.  (ECF No. 102.)  In this belated filing, he highlights Va. Code § 8.2-318, contending that this statute invalidates Defendant's argument that Myers cannot maintain a breach-of-warranty claim here.  (Br. in Supp. of Mot. to File Supp. Authority (ECF No. 103) ("Supp. Authority Br.") at 1.)  The relevant statutory provision reads as follows:

> Lack of privity between plaintiff and defendant shall be no defense in any action brought against the manufacturer or seller of goods to recover damages for breach of warranty, express or implied, or for negligence, although the plaintiff did not purchase the goods from the defendant, if the plaintiff was a person whom the manufacturer or seller might reasonably have expected to use, consume, or be affected by the goods; however, this section shall not be construed to affect any litigation pending on June 29, 1962.

Va. Code § 8.2-318.  In Plaintiffs' telling, Myers qualifies as an individual whom the manufacturer might reasonably have expected to use or be affected by the Vehicle, and thus Va.

Code § 8.2-318 allows him to recover under a breach-of-warranty claim.[8] (Supp. Authority Br. at 1.)

As this Court has recognized, the practical effect of Va. Code § 8.2-318 means that "Virginia law does not require privity between a reasonably foreseeable user and the manufacturer of an allegedly defective good to sustain a products liability action." *Porter v. DePuy Orthopaedics, Inc.*, 2019 WL 3979656, at *5 (E.D. Va. Aug. 6, 2019). As the sole owner of the LLC that purchased the Vehicle, Myers plausibly qualifies as a reasonably foreseeable user of the Vehicle. However, the Court will nonetheless exercise its discretion to DENY Plaintiffs' Supplemental Authority Motion, (ECF No. 102), because the Fourth Circuit has held that while Va. Code § 8.2-318 "preserves for remote users the warranties already enjoyed by an immediate purchaser," the statute "does not create for the benefit of nonpurchasing users an independent warranty of merchantability." *Buettner v. R.W. Martin & Sons, Inc.*, 47 F.3d 116, 118 (4th Cir. 1995). *Buettner* establishes that where "the seller gave no warranty to the purchaser, the remote user also lack[s] a warranty." *Hoffman v. Daimler Trucks N. Am., LLC*, 940 F. Supp. 2d 347, 364 (W.D. Va. 2013). And relevant here, *Buettner* held that "the statute in no way purports to limit a seller's ability to disclaim warranties to foreseeable users." *Buettner*, 47 F.3d at 118.

---

[8] Va. Code § 8.2-318 has existed on Virginia's statutory books for decades, so this situation stands in stark contrast to one in which a party makes a court aware of a recently issued judicial decision. *Cf. Estrada*, 2024 WL 98151, at *1 n.1 (granting motion for leave to file supplemental authority on that basis). Accordingly, because Plaintiffs should have known about this statutory provision during the pendency of the standard briefing schedule, they "should have included these supplemental authorities" in their MSJ opposition brief. *Jain v. Old Dominion Nat'l Bank*, 2021 WL 5003244, at *2 (E.D. Va. Jan. 12, 2021). However, even when considering this supplemental authority, the Court finds that Va. Code § 8.2-318 fails to aid Myers' UCC claim, for the reasons discussed herein.

Defendant validly disclaimed warranties to Road Runner (and thus also, following the logic of *Buettner*, to Myers), for two primary reasons. First, the Warranty Book excludes consequential damages. Plaintiffs make much of the fact that the Warranty Book's statement that:

> NO PAYMENT OR OTHER COMPENSATION WILL BE MADE FOR INDIRECT OR CONSEQUENTIAL DAMAGE OR INJURY TO PERSON OR PROPERTY OR LOSS OF REVENUE WHICH MIGHT BE PAID, INCURRED OR SUSTAINED BY REASON OF THE FAILURE OF ANY PART OR ASSEMBLY WHICH MAY BE REPAIRED OR REPLACED IN ACCORDANCE WITH THE TERMS OF THE WARRANTY.

(ECF No. 67-6 at 6.) The parties dispute whether the engine problems that gave rise to Myers' visits to various MBUSA repair shops constitute a "defect" or an anomaly. (MSJ Opp. at 8); (Def.'s Reply at 13). Drawing all reasonable inferences in favor of Plaintiffs as the non-movant, the Court infers that the engine problem could plausibly count as a defect and thus that the above-quoted passage from the Warranty Book does not automatically exclude consequential damages. *Carolina Transformer Co.*, 978 F.2d at 835. But as no party contests, the Warranty Book also includes a subsection entitled "Extra Expenses," which states that the "warranty does not cover payment for . . . other economic loss or consequential damages." (ECF No. 67-6 at 15.) Accordingly, the Warranty Book clearly disclaims payments for the precise types of economic losses that Myers seeks here. *See Am. Type Culture Collection v. Armanino, LLP*, 2018 WL 3633939, at *3 (E.D. Va. May 15, 2018) (granting summary judgment on claim for consequential damages, where "the remaining damages all seek consequential damages excluded from recovery" by a master service agreement).

Clauses like this, which limit or exclude consequential damages, stand valid "unless the limitation or exclusion is unconscionable." Va. Code § 8.2-719(3). "Unconscionability 'deals primarily with a grossly unequal bargaining power at the time the contract is formed.'" *What*

34

*Hurts, LLC v. Volvo Penta of the Americas, LLC*, 2024 WL 69070, at \*16 (E.D. Va. Jan. 5, 2024) (quoting *Envirotech Corp. v. Halco Eng'g, Inc.*, 364 S.E.2d 215, 220 (1988)).  Plaintiffs make no showing that the purchase of the Vehicle by Road Runner, a freight delivery business, reflected a situation of unconscionably unequal bargaining power.  The Warranty Book thus validly disclaimed the consequential damages that Plaintiffs now seek.

Second, and crucially, the Warranty Book stipulates that if a vehicle owner uses the vehicle "primarily for business and commercial purposes, then these implied warranties do not apply and MBUSA completely disclaims them to the extent allowed by law." (ECF No. 67-6 at 6.)  For the reasons discussed *supra* regarding the Lemon Law and MMWA claims, the record strongly indicates that Plaintiffs used the Vehicle "primarily for business and commercial purposes."  Therefore, even *if* the Court were to infer that Myers qualifies as a reasonably foreseeable user of the Vehicle pursuant to Va. Code § 8.2-318, he (and Road Runner) cannot maintain this UCC claim, due to the "primarily for business and commercial purposes" disclaimer.  And Plaintiffs make no argument that this disclaimer clause qualifies as unconscionable.[9]  As the Fourth Circuit held, Va. Code § 8.2-318 "in no way purports to limit a seller's ability to disclaim warranties to foreseeable users." *Buettner*, 47 F.3d at 118.

---

[9]      As an additional (but not necessary) reason that the UCC claim fails, Plaintiffs did not provide support for the proper measure of damages under Va. Code § 8.2-714(b), which provides that "the measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted."  Responding to Defendant's interrogatories, Plaintiffs emphasized the alleged "salvage" value of the Vehicle, rather than offering a measure of "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted."  Va. Code § 8.2-714(b); (ECF No. 67-11 at 7).  Plaintiffs thus fail to properly rebut Defendant's contention that they adequately offered a measure of damages under Virginia law.  (Def.'s Reply at 12.)  Their failure to do so constitutes yet another reason why they cannot prevail on their UCC claim.

Accordingly, even when giving all justifiable inferences to Plaintiffs, the UCC claim fails, and the Court will GRANT summary judgment for Defendant on Count III.

### E.    Supplemental Briefing Motion

Next, the Court turns to Plaintiffs' request for leave to file a supplemental brief in further support of their Lemon Law claim. Plaintiffs contend that the Court should exercise its discretion to permit this supplemental brief, because they raise a legal issue — whether the Vehicle qualifies as a "motor home" and thus stands subject to Virginia's Lemon Law — that no party has previously briefed. (ECF No. 101 at 2.) The Court thus examines Plaintiffs' proposed supplemental brief, (ECF No. 101-1), to examine whether this proposed filing would aid in the Court's decisional process or give rise to a dispute over material facts.

Plaintiffs cite to Va. Code § 59.1-207.11's definition of "motor vehicle," contending that the Vehicle qualifies as a "motor home" and thus falls under the Lemon Law's coverage.[10] (Supp. Br. at 2.) Plaintiffs attach as exhibits to their supplemental brief: (1) a link to a video that Myers allegedly took during a camping trip that demonstrates that he was living in the Vehicle; (2) a photograph of the Vehicle's interior indicating the same; and (3) a photograph that Myers took of himself on a sofa inside the Vehicle. (ECF Nos. 101-2, 101-3, 101-4.)

Upon review, the Court concludes that even if allowed as an additional filing, Plaintiffs' supplemental brief would not disturb the Court's grant of summary judgment for Defendant as to the Lemon Law claim. First, the supplemental brief creates no dispute over material facts, as the

---

[10]    To reiterate, Va. Code § 59.1-207.11 defines "motor vehicle" as "only passenger cars, pickup or panel trucks, motorcycles, autocycles, self-propelled motorized chassis of motor homes and mopeds as those terms are defined in § 46.2-100 and demonstrators or leased vehicles with which a warranty was issued." Accordingly, the Lemon Law only applies to the *self-propelled motorized chassis* of motor homes, not an entire motor home.

36

exhibits to Plaintiffs' supplemental brief simply offer further evidence of Myers' personal use of the Vehicle. But as explained *infra* in Section III.B.2, Myers' personal use flies in the face of the undisputed fact that the Vehicle constitutes a *Cargo* Sprinter Van, a distinct product subcategory used primarily for cargo transportation, and of the mileage data and other evidence underscoring that Plaintiffs did not use it "in substantial part" for personal purposes.

Second, while Plaintiffs seek to stretch the Lemon Law to apply to the Vehicle as a "motor home," they note that the applicable statute defines "motor home" as "every private motor vehicle with a normal seating capacity of not more than 10 persons, including the driver, designed primarily for use as living quarters for human beings." Va. Code § 46.2-100. Sprinter Cargo Vans' "essential characteristic[]" constitutes "being able to transport cargo." *Pleasure-Way Indus.*, 38 ITRD 1889, at *6. Just as "people sleep in their cars, but that does not turn a passenger car into a motor home," *Burke*, 113 F. Supp. 3d at 869, Myers may have lived in a Sprinter Cargo Van for certain periods, but that does not turn a cargo van into a motor home for purposes of the Lemon Law.

As my colleague, Senior District Judge John A. Gibney, Jr., observed: "[b]y emphasizing the inclusion of *only* those motor vehicles listed, the lemon law creates a limitation of liability, not an expansion." *Burke*, 113 F. Supp. 3d at 869. "What matters, with respect to the motor home, is the primary purpose of the design of the vehicle." *Id.* Analyzing the "primary purpose" of a Sprinter Cargo Van, the Court draws attention to a Federal Circuit case in which a motor home manufacturer bought Sprinter Vans and then converted them *into motor homes* for importation by adding "interior features such as fully plumbed kitchen and bathroom fixtures with freshwater and sewage tanks, water heaters, sleeping quarters, counter-tops with propane burners, microwave ovens, wall-mounted televisions, and refrigerators." *Pleasure-Way Indus.,*

37

*Inc. v. United States*, 878 F.3d 1348, 1349 (Fed. Cir. 2018). Affirming the United States Court of International Trade's determination on a summary-judgment record that the "imported motorhomes were commercially different from the exported Sprinter vans," the Federal Circuit credited the lower court's findings that the motorhomes "no longer resembled the exported cargo vans" and were "no longer classifiable as **motor vehicles for the transport of goods**." *Id.* at 1353 (emphasis added).

The Federal Circuit's holding buttresses this Court's conclusion that the *primary purpose* of Sprinter Cargo Vans constitutes the transport of goods and that this vehicular model stands categorically distinct from motor homes. And while Myers may argue that his use of the Vehicle for sleeping purposes "converted" the Vehicle into a motor home, this case does not feature a fact pattern where a manufacturer transformed a Sprinter Van by adding elaborate interior features through an industrial process. *Cf. id.* at 1349 (noting various changes to vehicles in "manufacturing facility"). Instead, as shown by Damera's examination of the Vehicle, the mileage data and Myers' contractual work with multiple commercial entities, Myers continued to use the Vehicle in accordance with its primary purpose: transporting cargo. The Court thus will DENY Plaintiffs' Supplemental Briefing Motion.

## F.    Supplemental Authority Motion

Lastly, for the reasons stated in the Court's analysis of the UCC claim, the Court will DENY Plaintiffs' Supplemental Authority Motion, (ECF No. 102), as the proffered authority — Va. Code § 8.2-318 — does not disturb the Court's conclusion that Defendant stands entitled to a judgment as a matter of law on Myers' UCC claim. *See supra*, section III.D.4.

## IV.   CONCLUSION

For the reasons stated herein, the Court will GRANT Plaintiffs' Record Supplementation Motion, (ECF No. 104); will GRANT Defendant's Motion for Summary Judgment, (ECF No. 67), on Counts I, II and III of Plaintiffs' First Amended Complaint, (ECF No. 20); will DENY the Motion to Exclude the Testimony of Jacyn Damera, (ECF No. 60); and will DENY AS MOOT the other pending *Daubert* motions, (ECF Nos. 62, 70, 72).  The Court will also DENY Plaintiffs' Sanctions Motion, (ECF No. 91), Supplemental Briefing Motion, (ECF No. 100), and Supplemental Authority Motion, (ECF No. 102).

Pursuant to Federal Rule of Civil Procedure 15(a)(2), "a party may amend its pleading only with the opposing party's written consent or the court's leave" after the as-of-right first amendment, and "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).  The Fourth Circuit has instructed that a request to amend should be granted unless "the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or amendment would be futile." *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 379 (4th Cir. 2012).  Here, the Court concludes that further amendment would be futile, as the Court already permitted Plaintiffs to amend their complaint, (ECF No. 19), and discovery has closed with Plaintiffs having failed to establish the legal or factual legitimacy of their case.

The Court sees no reason why further amendment would correct the fundamental deficiencies discussed herein.

Accordingly, the Court will DISMISS WITH PREJUDICE all of Plaintiffs' claims.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

An appropriate Order shall issue.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Date: August 15, 2024

40